IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON


GREGORY V. PUTNAM,

          Plaintiff,


v.                                Civil Action No. 6:05-cv-00312


JO ANNE B. BARNHART,
Commissioner of Social
Security,

          Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court are the parties' cross-motions for judgment on the pleadings.

Plaintiff, Gregory V. Putnam (hereinafter referred to as "Claimant"), filed an application for DIB on April 11, 2002,

alleging disability as of August 8, 1996, due to reflex sympathetic dystophy (RSD) in both hands and severe back and leg problems. (Tr. at 79, 80, 88.)  The DIB claim was denied initially and upon reconsideration on April 8, 2003.  (Tr. at 60; 67-8.) On July 28, 2003, Claimant filed an application for SSI, which was then escalated to the hearing level.  (Tr. at 473-5, 20.)  On June 6, 2003, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 69.)  The hearing was held on December 8, 2003 before the Honorable Arthur J. Conover.  (Tr. at 481-514.)  By decision dated April 13, 2004, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 20-34.)  The ALJ's decision became the final decision of the Commissioner on February 14, 2005, when the Appeals Council denied Claimant's request for review. (Tr. at 7-10.)  On April 13, 2005, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

     Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f),

3

416.920(f) (2004).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 21-2; Finding No. 2, tr. at 33.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of status post right carpal tunnel release with probable reflex sympathetic dystrophy and back pain. (Tr. at 28-9; Finding No. 3, tr. at 33.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 29; Finding No. 4, tr. at 33.)  The ALJ then found that Claimant has a residual functional capacity for a range of light work, reduced by nonexertional limitations. (Tr. at 32; Finding No. 6, 11, tr. at 33-4.)  As a result, Claimant cannot return to his past relevant work. (Tr. at 31; Finding No. 7, tr. at 33.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as scale machine operator, ironer, and cotton classer aide, which exist in significant numbers in the national economy. (Tr. at 32-3; Finding No. 12, tr. at 34.)  On this basis,

benefits were denied.  (Tr. at 32-3; Finding No. 13, tr. at 34.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Cellebreze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was 34 years old at the time of the administrative hearing. (Tr. at 489.)  He has an eleventh grade education.  (Tr.

at 490.)   In the past, he worked as a laborer for various companies, and as a car detailer.  (Tr. at 89, 493-4.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will discuss it further below as necessary.

1.   Treating physicians/Workers' Compensation reviews

Claimant injured his right hand at work in August 1996, apparently from working with a jackhammer some 12 hours a day. (Tr. at 464.) He visited Dr. Harry Fathy, M.D. the day after this injury.  (Tr. at 126.)  Claimant was unable to extend his fingers fully or to make a fist, and claimed loss of sensation in his hand. There was minimal swelling, and x-rays were negative.  (Tr. at 126.)  The next day, when Dr. Fathy examined Claimant again, he prescribed some exercises for Claimant's hand.  Id.  Three days later, the swelling was down, the numbness was gone, and Claimant had good range of motion in his fingers.  Dr. Fathy indicated that he intended to release Claimant to go back to work at the next visit.  (Tr. at 125.) At that visit, however, Claimant again complained of numbness in the palm of his hand, which did not follow any particular pattern, and also complained of pain.  (Tr. at 125.) Dr. Fathy offered to check Claimant again if he continued to have problems.  Id. However, the record does not reflect any further treatment with Dr. Fathy.

Approximately one year later, on July 21, 1997, Gary Miller, M.D. examined Claimant and ordered electrodiagnostic studies. (Tr. at 201, 127.) Results indicated findings consistent with moderate right carpal tunnel syndrome, and also noted that clinically, Claimant had tenosynovitis. Id.

Prasadarao Mukkamula, M.D. examined Claimant at the request of the Worker's Compensation Division on September 4, 1997. (Tr. at 130-4.) Dr. Mukkamula reviewed the EMG report and opined that its results indicated mild, rather than moderate, carpal tunnel syndrome. (Tr. at 131.) Upon physical examination, Dr. Mukkamala noted that it took considerable coaxing to lead Claimant to make a fist, but Claimant did have full range of motion, and his motor examination was normal. (Tr. at 133.) Dr. Mukkamala opined that Claimant had mild right carpal tunnel syndrome, and that clinically, he also suspected tenosynovitis in the right hand. Id.

Claimant underwent right carpal tunnel release as recommended by Dr. Miller on October 27, 1997. (Tr. at 200, 136-7.) Days later, on November 1, 1997, Claimant fell, causing his surgical wound to bleed. (Tr. at 145.) Claimant went to the emergency room, where the wound was cleaned and re-sutured with steri strips. (Tr. at 145-6.) Two weeks later, Claimant returned to the emergency room complaining of pain, numbness and tingling in his hand. The examiner noted that the numbness and tingling of all four fingers was not consistent with the neurologic abnormality of

carpal tunnel syndrome, nor was Claimant's inability to extend his fingers consistent with his presentation.  (Tr. at 152.) Claimant was given two Darvocet and a prescription for Motrin.  (Tr. at 152.)

A.J. Patel, M.D. examined Claimant on December 19, 1997. (Tr. at 158-9.) Claimant complained that he had severely restricted movement of his wrist and fingers post-surgery; that he sweated a lot without reason; and that he was unable to use his wrists and fingers due to pain.  He also stated that his hand became discolored (purple) when he walked with his hand down.  (Tr. at 158.)  Dr. Patel noted wrist swelling, discoloration and tenderness, and warmth in the right wrist and finger area as compared to the left.  Claimant was unable to make a fist or to use his wrist and finger area, and could not grab objects. (Tr. at 158-9.)

Dr. Patel's impression was acute reflex sympathetic dystrophy, for which he recommended nerve blocks.  (Tr. at 159.) Dr. Patel performed these by trigger point injections on December 20, 1997. (Tr. at 160.)

Thereafter, Claimant attended a few sessions of physical therapy at the Rehabilitation Center of St. Joseph's Hospital in December, 1997 and January, 1998.  (Tr. at 181-86.)  His attendance was sporadic and his progress was minimal.  Id.

Bruce A. Guberman, M.D. of Tri-State Occupational Medicine,

Inc. examined Claimant at the request of Worker's Compensation on May 20, 1998. (Tr. at 162-7.) Claimant told Dr. Guberman that he was unable to work, ride a four-wheeler, ride a bicycle or drive a four-speed truck. (Tr. at 163.) Dr. Guberman noted that Claimant had no redness, warmth or swelling in either wrist, and had normal range of motion in both wrists. (Tr. at 165.) Claimant complained of tenderness in his right hand and an inability to extend his fingers. He was able to write, button and pick up coins with his right hand, but slowly and with difficulty. (Tr. at 165.) Dr. Guberman noted that grip strength testing was variable and therefore possibly not maximal. He also noted that this testing revealed a level response on the right, as opposed to the normally expected bell shaped curve. Dr. Guberman's impression was probable reflex sympathetic dystrophy of Claimant's right hand. (Tr. at 166.)

During this same period of time, Claimant continued treatment with Dr. Miller, who recommended continued physical therapy and stellate blocks in his right arm. (Tr. at 193-96.) On June 3, 1998, Dr. Miller noted that Claimant had less than 50% participation in physical therapy and that he had refused the prescribed nerve blocks. Dr. Miller recommended that Claimant's Worker's Compensation claim be closed because of Claimant's lack of cooperation. (Tr. at 193.)

On November 19, 1998, Dr. Miller discharged Claimant from his

care due to resolving reflex sympathetic dystrophy, as well as conflicts with Dr. Miller's staff and Claimant's "severe difficulties with compliance." (Tr. at 191.)

Claimant visited Dr. Patel again on June 12, 1998 at the request of Dr. Miller, due to continued hand complaints. (Tr. at 169-70.) Dr. Patel examined Claimant and diagnosed chronic reflex sympathetic dystrophy, bilateral extremities; tendinitis; and shoulder-hand syndrome. He recommended a series of six suprascaluplar nerve blocks, trigger point injections, and stellate ganglion blocks. (Tr. at 170.) Dr. Patel's long term plan was to alleviate Claimant's symptoms so that Claimant could return to work. Id.

Claimant underwent these blocks and injections by Dr. Patel on June 18, 1998. However, as he had done in the past, Claimant failed to present for the next series on June 19, 1998. (Tr. at 171.) Dr. Patel indicated that Claimant's refusal to present for treatment adversely affected his progress, and that it would be up to Claimant to resume treatment on a regular basis and appear at scheduled times. There are no notes of follow-up treatment with Dr. Patel beyond that date. (Tr. at 171.)

Claimant attended one session of physical therapy on June 1, 1998, and failed to appear for appointments thereafter. He discontinued treatment without explanation. (Tr. at 173, 180.)

Dr. Patel's notes reflect that on September 18, 1998, he

10

officially discontinued treatment of Claimant due to Claimant's repeated failure to appear for appointments. (Tr. at 188.)

On August 1, 1999, Claimant visited Marietta Memorial Hospital with complaints of low back pain after lifting the tongue of a boat trailer. (Tr. at 207.) Notes reflect that he was not taking any medications at that time. X-rays of Claimant's spine in connection with that visit indicated spondylolisthesis, but were otherwise normal. Id. The examining physician diagnosed acute lumbar myositis with radiculopathy, for which he recommended two or three days' rest and follow up with Claimant's family physician. Id.

Electrodiagnositic studies of August 17, 1999 were normal with no evidence of right carpal tunnel syndrome or ulnar neuropathy. (Tr. at 209.)

Claimant visited Heather McCarter, D.C. in November, 1999 seeking relief of bilateral hand numbness, swelling, and pain, as well as pain in his right wrist and hand. (Tr. at 221-5.) At Ms. McCarter's request, Peter J. Stern, M.D. of Hand Surgery Specialists, Inc. evaluated Claimant on December 4, 2000. (Tr. at 233.) Dr. Stern noted the normal EMG results above, and also observed that there was no evidence of thenar atrophy and that range of motion of the right thumb and index fingers was full. He noted that Claimant's right middle, ring and small fingers were clawed. (Tr. at 233-4.) Dr. Stern suspected that Claimant had some sort of conversion disorder, but noted that there was "a

11

paucity of objective positive findings." He suggested repeated electrodiagnostic studies but stressed that he did not believe Claimant had a surgical problem. In fact, Dr. Stern suggested that psychological counseling might be appropriate. (Tr. at 234-5.)

Ms. McCarter continued to treat Claimant chiropractically. (Tr. at 254-58, 275-377.) She referred Claimant to Oasis rehabilitation services on August 28, 2001. (Tr. at 253.) Oasis' notes indicate that Claimant attended sessions from October 8, 2001 through October 18, 2001. He missed one visit due to his reported need to see a physician about his high blood pressure. However, thereafter, he discontinued treatment without explanation. (Tr. at 378.)

A nerve conduction study performed on February 5, 2001 on the median and ulnar nerves of the right arm were unremarkable. The report concluded that this was a normal study giving no evidence of motor neuron root plexus nerve or muscle lesions. (Tr. at 247-8.)

From February 24, 1999 through March 4, 2002, Claimant visited Mountaineer Pain Relief and Rehabilitation Centers eight (8) times, under the care of Donna Davis, D.O. and Michael Shramowiat, M.D. (Tr. at 457-465.) Claimant complained of hand numbness and pain. Dr. Davis diagnosed right carpal tunnel syndrome, history of reflex sympathetic dystrophy, and bilateral ulnar neuropathy, for which she ordered an EMG and nerve conduction study. (Tr. at 465.) These, like prior studies, were normal. (Tr. at 468.) Claimant's

12

motor activity could not be assessed due to poor effort.  (Tr. at 468.)

Claimant did not return to this office for treatment beyond March 1999 until September 2001, a period of more than two years. (Tr. at 462, 463.)  At that time, he complained of moderate to severe pain and weakness in his right hand, for which he was taking ibuprofen. (Tr. at 462.) He stated that he had ongoing headaches and neck pain extending into his right upper extremity. Id.  His hand strength and sensation were reduced.  Id. In October, 2001, Dr. Shramowiat noted that Claimant had intrinsic minus right hand, and that his sensation was diminished in the ulnar nerve distribution and overlap[ped] with the C8 nerve root distribution in his right hand.  (Tr. at 461.)

In November, 2001, Dr. Shramowiat noted that Lortab provided good pain relief to Claimant. He could not test Claimant's upper extremity grip to due Claimant's contractures of the third, fourth and fifth digits of his right hand and complaints of pain.  (Tr. at 460.) On December 27, 2001, Dr. Shramowiat observed that Claimant continued to have RSD symptoms with intrinsic minus hand and weakness of all the intrinsic hand muscles.  (Tr. at 459.) In January, 2002, he noted that Claimant's grip strength in his upper extremity was 2/5 and that Claimant could not grip completely with his right hand.  (Tr. at 458.)

On September 11, 2002, Claimant presented to the hospital due

to chest pain which began as he was digging posts. (Tr. at 405.) Upon the examining physician's advice, Claimant underwent a stress test on August 21, 2002. This test was negative, but was terminated before Claimant achieved his target heart rate due to left groin pain. (Tr. at 400.) A subsequent cardiac catheterization showed normal left ventricular functioning and a normal coronary angiography. (Tr. at 408.)

Joel Shiffler, M.D. treated Claimant for assorted problems from November 2002 through October, 2003. (Tr. at 424-30, 447-56.) He prescribed medications including psychotropic medicines for depression and anxiety. (Tr. at 424-30, 447-56.) A note on December 6, 2002 reflects that Claimant had fallen off a four-wheeler the preceding week. He reported being told at the emergency room that he fractured his right shoulder with AC separation. (Tr. at 427.) Another note reflects that Claimant was walking four miles a day. (Tr. at 425.)

In 2003, Claimant's cardiologist, Stanley M. Pamfilis, M.D., FACC, reported to Dr. Shiffler that Claimant had multiple complaints which might be related to his medications. He recommended adjustment of several of Claimant's psychotropic medications and anti-inflammatory medications. (Tr. at 439.)

While Claimant alleges depression and anxiety as conditions contributing to his disability, he has not treated with any mental health care professionals, and there are no records of treatment

other than those of Dr. Shiffler pertaining to those conditions.

### 2.   State agency reviews

On November 20, 2002, state agency medical source Alfonso Morales, M.D. evaluated Claimant.  (Tr. at 412-15.)  Dr. Morales opined that Claimant should be able to perform some type of gainful employment that would not involve use of his right hand.  (Tr. at 412, 414.) While Claimant's right hand grip strength was zero and he reported pain while grasping or attempting to carry objects with his right hand, the range of motion testing was within normal limits and Claimant had no muscle atrophy.   (Tr. at 414.) Claimant's flexion and extension of his back were normal, although reportedly painful.  (Tr. at 414.)

A state agency medical source completed a Physical Residual Functional Capacity Assessment through December 2000, Claimant's date last insured.  (Tr. at 416-23.) The source concluded that Claimant could perform a reduced range of medium work. Id.  A second state agency reviewer concluded that Claimant could perform a reduced range of light work through December 2000. (Tr. at 431-38.)

### 3.   Additional X-ray Tests

X-rays of Claimant's hand taken on May 20, 1998 were normal. (Tr. at 161.) X-rays of Claimant's lumbar spine in August 1999 indicated no evidence of acute fracture or destructive process, and only an incidental note of spina bifida occulta at S1. (Tr. at

228.)

X-rays of Claimant's cervical and dorsal spine in April, 2000 were normal. (Tr. at 226.)   X-rays of Claimant's right shoulder on March 8, 2001 indicated an old AC separation, but no acute injury, and no soft tissue calcifications. (Tr. at 252.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to properly assess Claimant's pain and credibility under Craig v. Chater, 76 F.3d 585 (1966); and (2) the ALJ failed to consider all of the medical evidence relevant to the claim. (Pl.'s Br. at 1-13.)   Defendant responds that the ALJ correctly evaluated Claimant's pain, and that the decision was supported by substantial evidence in all respects. (Def. Br. at 3-20.)

1.   Pain and Credibility Analysis

A two-step process is used to determine whether a claimant is disabled by pain.  First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged.  20 C.F.R. § 404.1529(b)(2004); SSR 96-7p, 1996 WL 374186 (July 2, 1996); see also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).   If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated.  Craig, 76 F.3d at 595.  When a claimant proves the

existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 404.1529(c)(4)(2004). Additionally, the regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3)(2004).

SSR 96-7p repeats the two-step regulatory provisions.

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p, 1996 WL 374186, at *2 ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Craig, 76 F.3d at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

18

In this case, the ALJ determined the first step of the inquiry in favor of Claimant. (Tr. at 29.) However, Claimant argues that the ALJ failed to consider all of the medical evidence pertaining to his condition and his pain, and erred in deeming Claimant was not entirely credible. (Pl.'s Br. at 10-11.) He argues that the ALJ erred in finding inconsistencies in the record, unimpressive medical findings, and lack of consistent treatment for all symptoms. Id.

In support of his position, Claimant cites first to his own description of his pain, and then to the records from his chiropractor. (Pl.'s Br. at 10-11.) However, Craig does not require an ALJ to accept a Claimant's description of pain, especially when that description altogether contradicts the objective medical evidence and other evidence of record. Here, the ALJ's detailed discussion of Claimant's medical records spanned some 6 ½ pages. (Tr. at 22-28.) In considering these, the ALJ correctly noted that physicians detected symptom magnification, that objective evidence such as atrophy of the hands was lacking, and that there were no objective findings of Claimant's purported diagnosis of reflex sympathetic dystrophy. (Tr. at 22-28, 30.) The ALJ observed that none of the physicians, specialists, procedures or tests indicated objective evidence consistent with the alleged severity of Claimant's symptoms. (Tr. at 31.)

The ALJ summarized Claimant's stated daily activities of

19

sleeping, sitting on the porch, helping with his children and reading. He found that Claimant's medical records did not support this level of restriction and inactivity. (Tr. at 30-31.) The ALJ further noted that in spite of the limited activity Claimant portrayed, Claimant's medical records documented that he engaged in such heavy activities as lifting the tongue of a boat trailer and digging fence holes during his alleged period of disability. (Tr. at 31, <u>citing</u> tr. at 207, 405.)

In his discussion of Claimant's medical records, the ALJ noted Claimant's lack of consistent treatment, which also contradicted the severe pain and limitation he alleged. Claimant failed to complete physical therapy each of the three times it was prescribed. (Tr. at 24.) Claimant failed to appear to Dr. Patel's office for appointments and the prescribed nerve blocks so many times that Dr. Patel discharged him as a patient. (Tr. at 24, <u>citing</u> tr. at 188.) Dr. Miller likewise terminated his care of Claimant due to Claimant's conflicts with Dr. Miller's staff and his severe difficulties in compliance with treatment. (Tr. at 24-25, <u>citing</u> tr. at 189.) Claimant engaged in a rehabilitation program in October 2001, however, discontinued treatment due to alleged blood pressure problems, and never re-contacted the office for explanation or to resume treatment. (Tr. at 26, <u>citing</u> tr. at 378.)

The ALJ considered Claimant's medications and the fact that

Claimant reported drowsiness associated with these. (Tr. at 30-1.) However, the ALJ observed that there was no indication in Claimant's medical records that he had complained of drowsiness. Id.

From the above, it appears that the ALJ correctly applied the Craig v. Chater analysis, with careful consideration of its designated factors.

Claimant's reliance upon the records of Ms. McCarter is misplaced. A chiropractor is not an acceptable medical source. 20 C.F.R. § 404.1513 and 416.913. As such, the ALJ properly afforded her opinions little weight. (Tr. at 25.)

The court proposes that the presiding District Judge find that the ALJ's analysis of Claimant's pain and credibility was proper, and that his decision was supported by substantial evidence.

### 2.   Failure to Consider All Medical Evidence

Claimant argues that alternatively, this case must be reversed or remanded because the ALJ failed to consider records from Mountaineer Pain Relief and Rehabilitation Center (Drs. Shramowiat and Davis). (Pl.'s Br. at 11.) The court notes at the outset that the fact that the ALJ did not specifically mention those records in his 6 ½ page description of Claimant's medical history does not conclusively establish that he failed to consider them. In fact, the crux of the ALJ's decision stated as follows:

> The claimant has been treated by *numerous physicians, including specialists, and has*

21

> *undergone various procedures and tests*, none
> of which have indicated objective evidence
> consistent with the alleged severity of the
> claimant's symptoms.   Based on the above
> inconsistencies, the unimpressive medical
> findings and the lack of consistent treatment
> for all symptoms, the undersigned finds the
> claimant is not entirely credible.

(Tr. at 31.)

Claimant argues that his regular visits to Drs. Davis and Shramowiat at Mountaineer Pain Relief prove that he consistently sought relief for his condition.  (Pl.'s Br. at 11-12.)  However, Claimant visited Drs. Shramowiat and Davis only eight times in a three-year period, which included a gap in treatment for over two years.   (Tr. at 462-3.)   Moreover, medical exploration of Claimant's hand complaints are well-documented elsewhere in the record.   As Defendant points out, thirteen different medical sources evaluated Claimant's right arm/hand complaints; and none of them concluded that Claimant was disabled by these as he asserts. Notably, neither Dr. Shramowiat nor Dr. Davis rendered any opinion as to Claimant's ability to work or function.  (Tr. at 457-68.) Much to the contrary, the objective EMG and nerve conduction studies ordered by these physicians yielded normal results.  (Tr. at 465, 468.)

Finally, while it is true that these eight (8) visits in three years indicates that Claimant made some effort to pursue pain relief and treatment, the remainder of the record still documents inconsistent treatment overall, as discussed above.  Moreover, Dr.

22

Shramowiat's notes show that Claimant experienced good pain relief with medication, and that he had no side effects.  (Tr. at 457-8, 460.)  Claimant's complaints that he is disabled by pain are substantially undercut by this opinion.

As such, Claimant has not shown how any of the records from Mountaineer Pain Relief could change the outcome of his case.  If in fact the ALJ failed to consider them, this would be harmless error rather than grounds for reversal.  As stated in <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir.1988), "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected."  Procedural improprieties will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.  <u>Morris v. Bowen</u>, 864 F.2d 333, 335 (5th Cir. 1988); <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989)("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").  While these cases come from other circuits, the Fourth Circuit, in a number of unpublished decisions, has taken the same approach.  <u>See</u>, <u>e.g.</u>, <u>Bishop v. Barnhart</u>, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); <u>Camp v. Massanari</u>, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); <u>Spencer v. Chater</u>, No. 95-2171, 1996 WL

36907, at *1 (4th Cir. Jan. 31, 1996).

Claimant then makes a conclusory argument that due to his various limitations, he is unable to perform even sedentary work. (Pl.'s Br. at 11-12.) Claimant however has not submitted an opinion from any medical source that his conditions, alone or in combination, result in disability to perform light or sedentary work. He asks the court to disregard substantial medical evidence relied upon by the ALJ and to form its own conclusion as to his capabilities. This cannot be done.

The court proposes that the presiding District Judge find that the decision of the ALJ was supported by substantial evidence in all respects.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **DENY** the Plaintiff's Motion for Judgment on the Pleadings, **GRANT** the Defendant's Motion for Judgment on the Pleadings, **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this written opinion and Order and to mail a copy of the same to counsel of record.

 June 5, 2006            _Mary E. Stanley_
      Date            Mary E. Stanley
            United States Magistrate Judge